**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**WESTERN SIZZLIN CORPORATION,**

       **Plaintiff,**

-vs-                                                    Case No. 6:10-cv-1452-Orl-31DAB

**PINNACLE BUSINESS PARTNERS, LLC,**

       **Defendants.**

_____

## MEMORANDUM OPINION AND ORDER

This is a trademark infringement case brought by Western Sizzlin Corporation ("WS") against Pinnacle Business Partners, LLC ("Pinnacle") pursuant to the Lanham Act, 15 U.S.C. §§ 1114, 1125(a) and 1125(c). A bench trial was held on March 5, 2012.[1] The Plaintiff, WS, filed a post-trial memorandum (Doc. 55) which the Court has considered. The Defendant, Pinnacle, did not file a post-trial memorandum.

**I. Facts**

WS is a restaurant franchisor operating under the name "Western Sizzlin" with restaurants located in twenty states. Tr. p. 139. From 1995-2005, Owais and Saleem Khanani[2] operated a "Western Sizzlin" franchise ("the Restaurant") on US-192 in Kissimmee, Florida. In early 2005, the Khananis defaulted and WS terminated their franchise agreement. Tr. p. 126. In April 2005,

---

[1] Trial Transcript ("Tr.")

[2] The Khananis are not involved in the present lawsuit.

Joe Josephs, the landlord of the building, and Kamal Nkeiti formed Pinnacle, which took over the Restaurant's operations. Tr. p. 51.

Shortly thereafter, Pinnacle began negotiations with WS about possibly signing a franchise agreement. During the negotiations, from April until December 2005, the Restaurant continued to operate under the name "Western Sizzlin" with the permission of WS. Tr. p. 19, 51, 127. The Restaurant was not technically a "Western Sizzlin" franchisee, so it did not have access to franchisee benefits such as preferred vendor discounts, special training, signature steaks or special sauces. Tr. p. 49, 90, 102. WS did provide Pinnacle with price sheets, manuals and contracts, in hopes that it would eventually sign a franchise agreement. Tr. p. 116, 101-02, Ex. 13. Ultimately, Pinnacle did not enter into a formal franchise agreement with WS. Tr. p. 160.

In December 2005, Pinnacle paid WS royalties for its use of the "Western Sizzlin" name. Tr. p. 127. It returned all of WS's materials, de-identified as a "Western Sizzlin" restaurant, and began operating as "Sizzlin Grill."[3] Tr. p. 42-43, 56-57. Pinnacle distinguished the Restaurant from a WS operation in three ways: (1) it changed the Restaurant's name and sign, (2) it altered the exterior and interior of the Restaurant, and (3) it changed the Restaurant's operations.

First, Pinnacle replaced the face of the "Western Sizzlin" pole sign with the new "Sizzlin Grill" logo. Ex. 2. It also changed the signs on the front and rear of the building and signs in the driveways. Ex. 3, 7.

---

[3] Although the de-identification chart on record is useful for analyzing the changes Pinnacle made to distinguish itself from a WS operation, Pinnacle was not bound by this chart because it was never a formal franchisee of WS. Ex. 14.

Second, Pinnacle made changes to the building's exterior. Previously, it had dusty pink accents and a light pink, metal awning. Tr. p. 52-53, Ex. 2. Pinnacle installed new red and white striped awnings. Ex. 3. It repainted the accents on the front columns and beneath the windows a dark rust color. The accents on the tower of the building, just above the main sign, were repainted white and yellow. Tr. p. 52-53, Ex. 3.

Pinnacle also renovated the interior of the Restaurant. According to the WS Franchise Agreement and the testimony of Richard Henderson,[4] WS franchisees must conform to its specifications and standards for design, layout, fixtures, equipment, furnishings, decor and signs. Tr. p. 111, Ex. 55. Independent of any such specifications and standards, Pinnacle repainted the walls and the buffet bars using a different color scheme.[5] Ex. 4. Pinnacle covered up the "Hot Bar" sign above the hoods of two of the bars and left the "Cold Bar" and "Salad Bar" signs above the third bar. Ex. 4. Pinnacle replaced the white and mauve, aluminum furniture with "rustic" wooden furniture. It built a Key West-style gazebo around one of the bars, removed the potato bar and removed old "Western Sizzlin" menu boards and menus. Tr. p. 53.

Finally, Pinnacle changed the operations of the Restaurant. It is a flat-price, low-cost super buffet. There are no menus or options other than the full buffet. Tr. p. 53. In contrast, "Western Sizzlin" is a traditional family steakhouse. It offers a menu with a variety of steaks and an optional buffet. Tr. p. 53-54.

---

[4] Richard Henderson works for the Western Sizzlin Franchise Corporation. Tr. p. 98.

[5] Del Josephs testified that Pinnacle changed the color scheme from WS's previous yellow and green, to a seafoam, bluish-green color. The photographs in evidence are of poor quality as to exact colors, but the changes made are sufficiently distinct.

Tourists comprise 95% of Pinnacle's business. Tr. p. 50. It advertises the Restaurant in local tourist magazines and near-by hotels. WS, on the other hand, maintains a website for advertising its franchise. Tr. p. 122-23. A separate marketing company provides WS's franchisees with advertising for their individual restaurants, including some television commercials. Tr. p. 156-58.

Notwithstanding these changes, WS contends that the Restaurant infringes its trademark in violation of §§ 32, 43(a), and 43(c) of the Lanham Act. WS claims that Pinnacle's trade name, "Sizzlin Grill," and the design of its sign infringe the WS trademark because of the shared word "Sizzlin" and the similarities in the font, style and color scheme. Doc. 55 p. 3. WS also contends that the Restaurant's business operations infringe the WS trademark because its products, services and advertising methods are "similar, if not identical" to a "Western Sizzlin." Doc. 55 p. 4. Finally, WS claims that Pinnacle intended to benefit from WS's name by copying its trademark and concept. Doc. 55 p. 5.

WS seeks injunctive relief and monetary damages amounting to the franchise fees that Pinnacle would have paid to WS during the five years of the Restaurant's operations as "Sizzlin Grill" and damages for the loss of potential franchisees.

**II. Legal Principles**

The Lanham Act, Title 15 U.S.C. § 1114(a) provides that any person who uses a "copy, or colorable imitation of a registered trademark" that is "likely to cause confusion" will be liable in a civil action by the registrant. Section 1125(a) provides that anyone who uses a "word, term, name, symbol . . . or any combination thereof" that is "likely to cause confusion . . . as to the affiliation" of one person with another, or "as to the origin, sponsorship, or approval of his or her . . .

commercial activities" with those of another person shall be held liable in a civil action for damages caused by the unauthorized use. The touchstone for trademark cases is the likelihood of consumer confusion. *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1337 (11th Cir. 1999).

The Eleventh Circuit uses a seven-factor test to analyze trademark infringement claims. The factors include: (1) the type of the mark, (2) the similarity of the marks, (3) the similarity of the products the marks represent, (4) the similarity of the parties' retail outlets and customer base, (5) the similarity of advertising media, (6) the defendant's intent, and (7) actual confusion. *Id.* at 1335. The type of mark and the evidence of actual confusion are the most important factors. *Id.*

The first factor, a trademark's type, is divided into four categories: arbitrary, suggestive, descriptive or generic. The type of mark determines its strength and the relative protection it is afforded. Arbitrary marks get the most protection, while generic marks get the least. *Welding Servs. v. Forman*, 509 F.3d 1351, 1357 (11th Cir. 2007). Arbitrary marks have no relation to the product being sold. Suggestive marks refer to a characteristic of the product being sold, but require a consumer to use his imagination to link the mark to the product. Descriptive marks describe a characteristic or quality of the product or service. Finally, generic marks represent the product or service exactly. *Frehling*, 192 F. 3d at 1335.

The inquiry into a trademark's strength does not end with assigning it to one of the four categories discussed above. The strength of a trademark may be weakened by the frequency with which third parties use the mark or its component parts. *Alaven Consumer Healthcare, Inc. v.*

*DrFloras*, No. 1:09-CV-705-TWT, 2010 WL 481205, at *1 (N.D. Ga. Feb. 4, 2010), *aff'd*, 399 Fed. Appx. 545 (11th Cir. 2010).

**III. Findings and Discussion**

The ultimate issue is whether a customer would confuse the Restaurant with a "Western Sizzlin." The Court finds that customer confusion is not likely and the Restaurant does not infringe the "Western Sizzlin" trademark. The Court will address each of WS's claims in combination with the Eleventh Circuit's seven-factor test in the following order, (1) the trade name and signage of the Restaurant, (2) the interior and exterior of the building, and (3) the Restaurant's operations.

**A. Trade name and Signage**[6]

The WS trademark is a relatively strong mark. *See Frehling*, 192 F.3d at 1335. It falls in the "suggestive" category because "Sizzlin" refers to the characteristic "sizzling" of the steaks that WS sells, but it still requires some imagination to link the "Western Sizzlin" name to the steakhouse restaurant. *See id.* (stating that "penguin" would be suggestive of a refrigerator) (quoting *Freedom Sav. and Loan Ass'n v. Way*, 757 F.2d 1176, 1182-83 n.5 (11th Cir. 1985)). Its strength is weakened by the frequency with which third parties have used the component parts of the WS trademark. *See Alaven*, WL 2010 481205, at *3. For example, the red, green and white

---

[6] The similarities in the trade name and signage are addressed by the first and second factors of the seven-factor test – the strength of the mark and the similarities of the marks.

color scheme is used by several third-party restaurants such as Ponderosa Steakhouse and the Sizzler.[7] Tr. p. 77, Ex. 28, 29.

Although the fonts on the Restaurant's pole sign and WS's trademark are similar, they are not identical. Moreover, the font that WS uses is not unique, so the Restaurant's use of a similar font is unremarkable. All of the Restaurant's other signs use a font that is even more distinct from the WS trademark, as the letters are more rounded and bubble-like. Ex. 3, 7. The first and last letters of the primary words are enlarged on both the Restaurant's sign and the WS trademark, but in light of the other differences, this similarity is negligible.

The words on the sign are sufficiently different to dispel customer confusion. The primary phrases "Western Sizzlin" and "Sizzlin Grill" contain a different number of syllables and different sounds. *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 975-76 (11th Cir. 1983). The smaller, secondary phrases on the signs are even more dissimilar, sharing only the word "Steak." The Restaurant's secondary phrase is "All You Can Eat, Steak and Seafood," whereas WS's is "Steak & More, Restaurant." Ex. 3, 6. Furthermore, it is not surprising that the word "Sizzlin" appears in both restaurants' names, since both serve grilled food. *See Alaven*, WL 2010 481205, at *3 (finding the shared prefix "Dr." to be a sensible prefix for herbal supplement companies).

---

[7] Fairway Signs offered Pinnacle a good deal on the red, green and white materials because it had those colors left over from a Ponderosa job. Tr. p. 47-48, 77.

**B. Interior and Exterior Changes**[8]

Customer confusion is also unlikely because of the Restaurant's interior and exterior changes. Since WS requires franchisees to conform to the company's specifications and standards, the Restaurant's changes likely reflect deviations from the uniform WS specifications.[9] The exterior of the building and the awning are so distinct from the previous "Western Sizzlin" color scheme that customers will be aware of the differences in the two restaurants. The building's interior is also sufficiently distinct to dispel customer confusion. The new color scheme, the addition of the Key West gazebo, the new furnishings, and signage all indicate that the Restaurant is not a "Western Sizzlin." Any interior similarities are common among buffet restaurants. For example, the type of buffet bars in the Restaurant are not unique to "Western Sizzlin," but are similar to those found in restaurants like Ponderosa Steakhouse and Golden Corral. Tr. p. 114-115.

WS also fails to show that there is a significant overlap in the parties' customer base. The Restaurant's customer base is primarily that of tourists visiting Walt Disney World and other Central Florida attractions. WS on the other hand, has no restaurants in the State of Florida. The nearest WS restaurant is in Myrtle Beach, South Carolina and there is no evidence to suggest any overlap in these customer bases.

---

[8] These changes involve the fourth factor in the seven-factor test – the similarity of the parties' sales methods, such as retail outlets and customers.

[9] Jim Verney, the president and CEO of WS, visited the previous franchise in 2003. His follow-up memo suggested, among other things, that the restaurant looked dated, needed to replace pictures of the food served, and make interior renovations. He did not suggest any major overhauls in color schemes, furniture or layout of the restaurant. Ex. 51.

## C. Operations[10]

Finally, the operations of the Restaurant are distinct from a "Western Sizzlin." The Restaurant operates as a low-cost, flat-rate buffet, where a customer's only option is to pay for the entire buffet. "Western Sizzlin," on the other hand, is a traditional family style restaurant that offers a selection of steaks, available on a menu separate from the buffet.[11] WS's argument that the Restaurant's products and services are "very similar, if not identical" to a "Western Sizzlin" is not persuasive. WS relies on the mere fact that both restaurants have buffets and serve steak and seafood, but this is not unique to WS.

## D. Other Factors

The most important factor is actual customer confusion.[12] WS submitted two emails during trial, both received by WS after this lawsuit was filed. Counsel was unable to verify the emails' validity. Tr. p. 144. The Court finds that these emails are hearsay and lack probative value. Fed.R.Evid. 804(a)(5)(B), (b). No other credible evidence of actual customer confusion was presented. Even if the two emails were admitted, they show only a negligible amount of actual

---

[10] These changes involve the third and fifth factors of the seven-factor test – the similarity of the products or services the marks represent and the similarity of advertising media.

[11] WS recently developed a new concept called "Wood Fire Grill," which features a full-service buffet. WS suggests that Pinnacle used the word "Grill" and chose the full-buffet concept based upon the new "Wood Fire Grill" concept, but WS does not contend that Pinnacle infringes upon the "Wood Fire Grill" trademark. Tr. p. 114. The trademark for the "Wood Fire Grill" is so completely different from the Restaurant's sign that there is no possibility of confusion between the two. Tr. p. 98-99.

[12] Actual customer confusion is the seventh factor in the test.

customer confusion considering Pinnacle had about 1.6 million customers from 2005-2010.[13] Tr. p. 163-64; *see Tana v. Dantanna's*, 611 F.3d 767, 779 (11th Cir. 2010) (finding that evidence of two possible instances of customer confusion, over the course of five years and one million transactions, was negligible).

Although WS devotes much of its post-trial brief to Pinnacle's intent to benefit from the WS trademark, there was no evidence presented at trial to support this claim.[14] Pinnacle got a good deal on the red, white and green materials for its sign, which logically explains the chosen color scheme. Tr. p. 77. Its choice of the trade name "Sizzlin Grill" is unsurprising, considering Pinnacle is in the restaurant industry. Thus, the Court finds that Pinnacle had no intent to infringe the WS trademark. Indeed, it made extensive efforts to distinguish itself from a WS restaurant.

**IV. Conclusion**

The Court weighs the strength of WS's trademark and the actual customer confusion most heavily in its assessment of trademark infringement. *See Frehling*, 192 F.3d at 1335. The factor in favor of WS is the strength of the trademark, but its strength is off-set by the frequency with which third parties use its component parts. The minimal similarities in WS's trademark and the Restaurant's signs weigh slightly in favor of WS, but do not meet the preponderance of the evidence standard. The restaurants' products and services are somewhat similar, since both restaurants have buffets and serve steak and seafood, but this is outweighed by the lack of

---

[13] The average customer bill is $10.45. Tr. p. 92-93. Pinnacle had an average revenue of $1.6 million over the course of five years. Ex. 22-26. Therefore, the average number of customers over a five year period is about 1.6 million.

[14] Intent is the sixth factor in the test.

similarities in the retail outlets, customer bases, and advertising methods.  There is no evidence of actual confusion or Pinnacle's intent to benefit from the WS trademark, so these factors are not given any weight.

Given the considerable differences in the appearance and operations of the Restaurant and a "Western Sizzlin," a consumer would not likely be confused by the slight similarities in the signage, appearance and operations. Pinnacle's restaurant, the "Sizzlin Grill," does not rise to the level of trademark infringement.

For the reasons stated, it is **ORDERED** that the Clerk is directed to enter judgment for Defendant and to thereafter close the file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on June 5, 2012.

_____
**GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE**

Copies furnished to:

Counsel of Record
Unrepresented Party